IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

                                    :

NATURE-TECH, LLC
                                    :

                                    :

    v.                              :   Civil Action No. DKC 19-2053

                                    :

HARTFORD FIRE INSURANCE COMPANY,
et al.
                                    :

### MEMORANDUM OPINION

Presently pending and ready for resolution in this case stemming from a heavily litigated construction project is a motion for summary judgment filed by Plaintiff Nature-Tech, LLC ("Nature-Tech"). (ECF No. 27). The issues have been fully briefed, and the court now rules, no hearing being necessary. Local Rule 105.6. For the following reasons, the motion will be granted in part and denied in part.[1]

### I.   Factual Background

This case revolves around construction of a hotel and transition space "adjacent to the existing Maryland Live! Casino in Hanover, Maryland[.]" (ECF No. 27-1, at 1; 29-1, at 3). The Casino owner, PPE Casino Resorts MD LLC ("the Owner"), hired Tutor

---

[1] On March 19, 2022, eight months after its initial motion, Nature-Tech moved for leave to file a supplemental summary judgment memorandum. (ECF No. 31). The motion will be denied as untimely. The proposed memorandum raises even more questions about whether the record regarding withheld retainage payments is complete.

Perini Building Corporation ("Tutor Perini") to be the general contractor for the project. (ECF No. 27-1, at 2 ¶ 1; ECF No. 29-1, at 4). Tutor Perini hired Defendant Mortensen Woodwork, also known as Capitol Woodwork, LLC, ("Capitol") to furnish and install millwork. (ECF No. 27-2, at 1). A payment bond executed by Capitol and Defendant Hartford Fire Insurance Company ("Hartford") guaranteed Capitol's labor and material payments. (ECF No. 27-3, at 4). Capitol hired Nature-Tech to fabricate millwork worth $1,430,297.80 for the project. (*See* ECF Nos. 27-4; 27-5; 27-6).

At some point the project got behind schedule, (ECF No. 29-4, at 7 (Pickarts, Pawlowski, and Sellars Depo.)), and Capitol requested additional money from Tutor Perini for acceleration costs, (ECF No. 27-16, at 4-5 (Sukalo Depo.)). This resulted in a dispute between Capitol and Tutor Perini that is being litigated separately in Maryland state court but is central to this case. *See PPE Casino Resorts Maryland LLC v. Tutor Perini Building Corp.*, No. C-02-CV-19-002049 (Anne Arundel Cnty. Circuit Court 2019). Capitol contends that Tutor Perini breached their contract when it refused to approve additional payments. (ECF No. 29-7, at 6, 10-11; *see generally* ECF No. 29-22). Tutor Perini, which is not party to the suit here, disputes this characterization and accuses Capitol of holding the project "hostage" to its payment demands by "refusing to go ahead and continue with work of any kind." (ECF No. 27-16, at 4-5). Tutor Perini purportedly terminated Capitol

because of the delays.   (ECF Nos. 27-8; 27-9; 29-23, at 7-8).
Capitol believes otherwise, asserting that Tutor Perini plotted
with Nature-Tech to manufacture Capitol's termination and
replacement by Nature-Tech. (ECF No. 29-1, at 5, 10).

Nature-Tech's alleged coordination with Tutor Perini gave
rise to the dispute here.   On that and other grounds, Capitol
refused to pay Nature-Tech's outstanding billings.   Nature-Tech
claims that Defendants' denial of payment violated the terms of
their payment bond.   Capitol counterclaims that Nature-Tech
breached their contract by soliciting Tutor Perini and, through
the same conduct, tortiously interfered with Capitol's contract
with Tutor Perini.

**A.   Nature-Tech and Tutor Perini's Meeting in April or May 2018**

Nature-Tech's alleged solicitation and inducement begins with
a series of meetings at Nature-Tech's facilities.   Tutor Perini
and Capitol twice inspected the Nature-Tech facilities in early
2018.   (ECF No. 29-4, at 6).   Afterward, Capitol said Tutor Perini
was "welcome to continue [its] visits to Nature Tech to survey
materials in the manufacturing process as needed." (ECF No. 30-
2, at 1).   Nature-Tech and Tutor Perini were told, however, that
"anything that related to scheduling and delivery . . . had to go
through Capitol." (ECF No. 29-3, at 8; *see* ECF Nos. 29-4, at 17-
18; 29-8, at 1; 30-2, at 1).   Nevertheless, Tutor Perini began to

reach out separately to Nature-Tech, and Nature-Tech did not bring Capitol into the conversations.  (ECF No. 29-4, at 26).

Critically, Tutor Perini executives arranged for a meeting at Nature-Tech's facilities in April or May 2018.  Tutor Perini called Nature-Tech's CEO on a Friday afternoon and asked to visit the next Monday.  (ECF No. 29-4, at 8-9, 64).  Although Tutor Perini initiated the contact, Nature-Tech requested that a specific Tutor Perini executive with decision-making authority attend, as it had been instructed to do by Capitol.  (*Id.*, at 63-64).  Nature-Tech assumed Tutor Perini wanted to inspect the millwork again.  (ECF No. 29-4, at 10).  Having a decision-maker included was necessary because Nature-Tech was "scrambling to try and get things done [and] [t]here was a lot of mistrust back and forth."  (*See id.*, at 8, 64).

The meeting was not an inspection.  Instead, Tutor Perini executives "laid out their plans for terminating Capitol [by declaring default] and taking over their contract[.]"  (ECF No. 29-4, at 8).  Tutor Perini told Nature-Tech that its contract with Capitol gave it the right to request information about Nature-Tech's work.  (*Id.; see also id.*, at 13-14).  It specifically asked to inspect Nature-Tech's purchase orders with Capitol.  (*Id.*, at 13).  It told Nature-Tech that, after Capitol was terminated, it would write Nature-Tech purchase orders to complete work that

was not already under contract.  (*Id.*, at 14).  Nature-Tech did
not know of Tutor Perini's plans before the meeting.  (*Id.*).

B.   **Nature-Tech and Tutor Perini's Subsequent Communications in June**

After the meeting, Nature-Tech told Tutor Perini that it
wasn't "doing anything until there was a termination, and [it was]
moving forward on [its] contract [with Capitol] as it was." (ECF
No. 29-4, at 16, 49).  But Nature-Tech continued to respond to
Tutor Perini's requests to identify outstanding work, which
Capitol may not have known about.  (ECF Nos. 29-9 (June 12); 29-
13, at 2 (June 22); *see* ECF No. 29-4, at 27).[2]  It called a list
of outstanding work provided in a June 12 email "a starting point
for us to talk about." (ECF No. 29-9).  At times, the distinction
between possible future work and current work blurred.  In the
same June 12 exchange, Tutor Perini suggested it would be sending
information to create shop drawings, seemingly for headboards that
Nature-Tech incorrectly believed were outside the scope of its
purchase orders with Capitol.  (*See* ECF Nos. 29-10, at 2; 29-4, at
30, 34).  Nature-Tech asked whether they were "in a holding pattern
until [they] hear[d] back from [Tutor Perini] for an approval to
do" the work.  (*Id.*).

---

[2] Nature-Tech's assertion that Capitol was aware of certain
discussions is one of many examples in which it disputes Capitol's
factual assertions by citing deposition materials not in the
record.  (*See* ECF No. 30, at 17 (citing page 98 which is not
included in Defendants' excerpt, (*see* ECF No. 29-4, at 27-28))).

Tutor Perini responded that it expected Capitol would be terminated imminently. It had a meeting the next day with "the client" and hoped it would "be on-board with our direction" and give Tutor Perini "the authority to issue a Letter of Intent and follow up with a PO in a couple of days." (ECF No. 29-10, at 2; *see also* ECF No. 29-4, at 15, 32). Tutor Perini then asked Nature-Tech if it was "stopping everything [it] had in line that was for [Capitol] [] to make a clean break?" (ECF No. 29-10, at 2). Nature-Tech replied, "We are continuing with only the items we have a P.O. for with Capitol and all other items we would like to continue to finish the job with you." (*Id.*, at 1; *see also* ECF No. 29-4, at 33). The next day, Nature-Tech told Tutor Perini "that Capitol has been arranging and paying for all of the trucking" to the job site and, "[w]hen the time comes," that job would need to be reassigned. (ECF No. 29-11).[3]

## C.  Capitol's Termination

Capitol was not terminated immediately, despite the escalating conflict with Tutor Perini. (*See, e.g.*, ECF No. 29-13, at 1; 29-4, at 38; 27-16, at 2-5 (Sukalo Depo.)). The hotel opened in July 2018, implementing short-term fixes like painting

---

[3] Other examples of blurred lines include Nature-Tech emailing Tutor Perini in late June asking it to clarify if Nature-Tech would be fabricating certain items, (ECF No. 29-13, at 1), and emailing to request expedited payments, only to have Tutor Perini suggest payments should be addressed with Capitol, (ECF No. 29-12, at 2).

columns that were supposed to be wrapped in wood paneling.  (ECF No. 27-16, at 3).  But on July 31, the prospect of termination re-emerged.  (ECF Nos. 29-14, at 1; 29-4, at 39-40).  Capitol "directed its primary contractor installing millwork to de-mobilize from the Project" and "advised Nature-Tech not to make any further deliveries[.]"  (ECF Nos. 27-1, at 4, ¶¶ 11-12; 29-1, at 6; 29-7, at 5).  In its view, this was a response to "Tutor Perini's failure to pay [it] for work performed and to issue process and change orders in accordance with the terms" of their contract.  (ECF No. 29-7, at 5-6, 10-11).

The same day, Tutor Perini sent Nature-Tech a letter reiterating its right "to know from [Capitol's] Subcontractor(s) and Suppliers, when Purchase Orders were placed" and "any other pertinent information in regards to delivery and cost obligations that are required[.]"  (ECF No. 30-3).  The next day, August 1, Nature-Tech responded to a Tutor Perini request for updated information on the status of its purchase orders.  (ECF Nos. 29-15).  On August 23, Tutor Perini issued a 48-hour "Notice to Cure" demanding that Capitol release shipment of various completed items, issue purchase orders for other work, provide corrected fabrication drawings for certain on-hold work, and add manpower to complete installation.  (ECF No. 27-8).

Preceding the notice to cure, Nature-Tech provided more information on its workflow.  (ECF Nos. 29-16; 29-17; *see also* ECF

7

No. 29-4, at 42-43).  The day after the notice was issued, Tutor Perini and Nature-Tech held a meeting, and then worked over several days to curate an outstanding millwork log with price quotes and to draft a purchase order for future work.  (ECF Nos. 29-18; 29-19; 29-20; 29-21; *see also* ECF No. 29-4, at 48-49, 59).[4]  Amid these conversations, Nature-Tech told Tutor Perini that, to proceed with a contract, it wanted an indemnification letter and the contract language giving Tutor Perini the right to take over Capitol's sub-contracts.  (ECF No. 29-19, at 1).  Once in hand, Nature-Tech would send requested pricing information and expected then to receive new purchase orders from Tutor Perini.  (*Id.*).

On August 30, Tutor Perini declared Capitol in default and terminated it for failure to cure.  (ECF No. 27-9).  Nature-Tech had not completed all outstanding purchase orders with Capitol.  (ECF No. 27-1, at 4 ¶ 14; 29-1, at 6).  Tutor Perini notified Nature-Tech of the termination and its intent to complete Capitol's work through new contracts.  (ECF No. 27-10, at 1).  It later issued Nature Tech purchase orders totaling $51,963 for shipments and millwork.  (ECF Nos. 27-11; 27-12; 27-13; 27-14).

---

[4] Capitol contends that the meeting occurred on August 14. (ECF No. 29-1, at 13 ¶ 19).  The email cited in support was sent Monday, August 27 and refers to the discussion "on Friday," which most naturally refers to Friday, August 24.  (ECF No. 29-18, at 1).

D.   **Nature-Tech's Payment Bond Claim**

Capitol refused to pay Nature-Tech when it demanded payment for millwork completed and shipped, millwork in progress, and outstanding retainage.  (ECF Nos. 27-1, ¶ 19; 29-1, at 7).  Nature-Tech submitted a claim against the payment bond in the fall of 2018, ultimately claiming $473,961.70.  (ECF Nos. 27-1, ¶ 21; 29-1, at 7; 29-5, at 1).  Its billings were $1,356,031.80 and Capitol had paid $876,255.33, leaving $479,776.47 unpaid.  (ECF Nos. 29-5, at 1; 30-1, at 8).  Nature-Tech's insurance claim was for $5,814.77 less, which it appears to concede as improperly billed.  (*See* ECF No. 29-6, at 18).

Hartford determined Nature-Tech was owed $197,729.39 but that the $135,603.18 in retainage was not due and that Capitol was not liable for the remaining $140,629.13 in unpaid work.[5]  (ECF Nos. 27-1, ¶ 22; 29-1, at 7; 29-5, at 11).  Its primary focus was whether Nature-Tech billed for work it later stated was incomplete and for which, in some cases, it also received payment from Tutor Perini.  (*Id.*, at 3).  Capitol argued that it had overpaid for certain items and that some Tutor Perini payments should offset its liability.  (*Id.*).

Hartford analyzed thirty-two (32) items included in an August 30 outstanding millwork list developed by Tutor Perini and

---

[5] Financial information submitted with Nature-Tech's reply calculates retainage at $134,855.87.  (ECF No. 30-1, at 8).

Nature-Tech.  (ECF No. 29-5, at 3).  It concluded that Capitol was entitled to deductions for twelve items.  (*Id.*, at 11).  It appears Nature-Tech now concedes three.  (*See* ECF Nos. 29-5, at 11 (Items 2, 25, 26); 30, at 12 (identifying amount but not items conceded).  The findings for the nine other items are summarized here.

| Item No. | Description | Findings | Deduction |
|---|---|---|---|
| 6 | Spa elevator lobby wood panel accent wall | Nature-Tech conceded the item was never fabricated and claimed material costs but provided no purchase order for the materials | $4,794.77 |
| 8 | Café/lounge foot rail | Nature-Tech conceded the item was not complete at termination and claimed material costs but the purchase order was dated after termination | $7,350.20 |
| 9, 11, 12 | Column panels with metal laminate base and attached light boxes | Internal Nature-Tech project matrix and delivery request indicate glass for the light boxes was never delivered | $4,810.10 |
| 22 | Prefunction door entrances to ballroom surrounds and trims | Nature-Tech conceded the item was not complete at termination and claimed verified material costs but Hartford asserted that Nature-Tech was not entitled under the contract to payment for incomplete items and that Nature-Tech could seek payment from Tutor Perini | $25,364.00 |
| 28 | Wood veneer panels wall and surround at coat check, registration, & soffit panels | Nature-Tech stated that the materials were shipped in April and were used by Capitol in other areas but no documentation supported shipment or other use | $18,396.00 |

| Item No. | Description | Findings | Deduction |
|---|---|---|---|
| 29 | Ballroom 180 doors | Nature-Tech conceded the item was not complete at termination and claimed verified material costs but Hartford asserted that Nature-Tech was not entitled under the contract to payment for incomplete items and that Nature-Tech could seek payment from Tutor Perini | $8,335.00 |
| 30 | Ballroom base molding | Only three quarters of the total quantity originally requested was delivered | $6,342.25 |

Nature-Tech claims in this lawsuit that Defendants owe it $210,995.50 after conceding as improperly billed $71,051.58 of the $140,629.13 in deductions identified by Hartford. (ECF No. 27-1, ¶ 23). It requests $71,637.25 for unpaid work and, presumably, $139,358.25 in retainage. (*See* ECF No. 27-1, ¶ 23). It does not identify what work underlies its unpaid work request and it is unclear whether the work still disputed matches the items above. Hartford asserted $75,392.32 in deductions for those items but, as just noted, Nature-Tech now claims only $71,637.25 in unpaid work. Nature-Tech also does not explain why it seems to request a new retainage amount. Nor does it provide or refer to evidence countering the factual findings in Hartford's report.

## II. Procedural Background

Nature-Tech filed this diversity action in July 2019. (ECF No. 1). It asserted a single payment bond claim against both Defendants. (*See id.*, at 3-5). Hartford and Capitol answered,

and Capitol counterclaimed. (ECF Nos. 7; 9). Capitol's breach of contract and tortious interference counterclaims center on Nature-Tech's alleged solicitation of Tutor Perini and inducement to breach its contract with Capitol. (ECF No. 9, at 5-8). Nature-Tech answered and the parties exchanged discovery until June 2021. (ECF Nos. 11; 24; 25; 26). In July, Nature-Tech moved for summary judgment on all claims. (ECF No. 27). Defendants jointly opposed and Nature-Tech replied. (ECF Nos. 29; 30).

## III. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment should be granted only when it is perfectly clear that no issue of material fact exists." *Raynor v. Pugh*, 817 F.3d 123, 129 n.2 (4th Cir. 2016) (quotation omitted). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Liberty Lobby*, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (quotation omitted), but "a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences," *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element that he bore the burden to prove.  *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

## IV.  Nature-Tech's Payment Bond Claim

### A.   Choice of Laws

Maryland choice of law rules govern this case.  *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941).  The parties assume Maryland law applies to Nature-Tech's payment bond claim.  (ECF Nos. 27-1, at 9; 29-1, at 14).  The court applies Maryland law because it appears the payment bond adopts it.  *See Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 469 (4th Cir. 2011) (quoting *Kronovet v. Lipchin*, 288 Md. 30, 43 (1980)) ("[P]arties to a contract may

13

agree to the law which will govern their transaction[.]"). The
bond incorporates by reference Capitol's contract with Tutor
Perini which is "construed and enforced with and under the laws of
the State of Maryland[.]" (ECF Nos. 27-3, at 5; 27-2, at 17).

**B. Analysis**

"A surety bond is a three-party agreement between a principal
obligor, an obligee, and a surety." *Atl. Contracting & Material
Co. v. Ulico Cas. Co.*, 380 Md. 285, 299 (2004) (citation omitted).
"In a payment bond, the surety guarantees the principal's duty to
the obligee to pay its (the principal's) laborers, subcontractors,
and suppliers." *Id.* (citation omitted). The surety's liability
is "coextensive with that of the principal," *id.*, and, in general,
"is defined by the liability of the underlying contract" between
the principal and the obligee, *see United States v. Hartford
Accident & Indemnity Co.*, 168 F.Supp.3d 824, 832 (D.Md. 2016)
(Miller Act case); *see Gen. Builders Supply Co. v. MacArthur*, 228
Md. 320, 326 (1962) (cited favorably in *Atl. Contracting*, 380 Md.
at 300) ("[I]t is clear that the liability of the surety is
measured by the contract of the principal."). Surety bonds are
construed consistent with ordinary principles of contract
interpretation. *Id.*, 300-01. The meaning of contract language is
a question of law determined objectively. *Cochran v. Norkunas*,
398 Md. 1, 16 & n.7 (2007). If the language is unambiguous, courts
must "give effect to its plain meaning[.]" *Id.*, at 16 & n.8.

14

Where the language in a surety bond is ambiguous, courts "will resolve [it] in favor of the insured." *Atl. Contracting*, 380 Md. at 301 (citation omitted).

The payment bond here states that Capitol and Hartford, "bind themselves . . . to pay for labor, materials and equipment used or reasonably required and furnished for use in the performance of" Capitol's contract with Tutor Perini, "which is incorporated in th[e] bond by reference and pursuant to which th[e] bond is issued." (ECF No. 27-3, at 4-5). "[E]very Claimant, who has not been paid in full" within ninety (90) days after "the date on which the last of such Claimant's work or labor was done or performed, or materials were furnished by such Claimant . . . may have a right of action on th[e] bond." (*Id.*, at 5). The bond becomes "null and void" if Capitol "promptly fully pay[s] and discharge[s]" all of its "obligations for all labor, material and equipment as well as any other obligation arising either directly or indirectly by reason of performance of" the contract between Capitol and Tutor Perini. (*Id.*). The bond's purpose is to indemnify Tutor Perini from claims under its contract with Capitol. (*See id.*; ECF No. 27-2, at 6 (payment bond), 10-12 (indemnification)).

This language makes clear that Capitol and Hartford are liable for any labor or material reasonably furnished in performance of Capitol's contract with Tutor Perini. Because Capitol's contract

15

with Tutor Perini was terminated on August 30, 2018, the bond can cover only labor performed and materials acquired up to that date, or perhaps the date on which Nature-Tech first learned of Capitol's termination.  As noted above, Nature-Tech claims two categories of damages: (1) unpaid millwork, and (2) retainage.

Material disputes of fact preclude judgment on Nature-Tech's $71,637.25 unpaid millwork request.  First, it is not at all clear that Nature-Tech could meet its burden by citing, on reply, to a spreadsheet documenting its billings to and payments from Capitol without specifying the billing date or the millwork for which it is now requesting payment, accounting for its concessions.  Even assuming that is enough, Hartford's report found that some of Nature-Tech's claimed performance occurred after Capitol's termination, was only delivered in part, or that its delivery and timing was unsubstantiated.  (ECF No. 29-5, at 4-10).  Of course, this finding only applied to some of Nature-Tech's claimed costs and Defendants do not appear now to assert other defenses, aside from Nature-Tech's failure to specify the millwork underlying its claim in this lawsuit.  For that very reason, however, it is impossible to award even partial judgment to Nature-Tech.  Assuming again that Nature-Tech has made a sufficient initial showing, there is no way to identify which work is at issue and therefore which work's performance is contested and which work's is not.

For essentially the same reason, Nature-Tech fails to show that undisputed facts entitle it to the retainage. It has not demonstrated how much payment Capitol retains. There are two amounts between Hartford's report and Nature-Tech's billings. (ECF No. 29-5, at 11; 30-1, at 8). In addition, Nature-Tech never specifies a claimed retainage amount in its initial motion or its reply. Deducting the specified unpaid millwork amount from the total amount requested leaves yet a third retainage figure.[6]

Nature-Tech's motion for summary judgment on its payment bond claim will be denied.

---

[6] It is not necessary to reach Defendants' arguments about whether retainage payments are due to Nature-Tech under its contract with Capitol. It is worth noting, however, that the parties have not addressed the degree to which liability on a payment bond can be limited by a subcontract executed by the bond's principal. On the one hand, the payment bond's terms clearly anticipate liability beyond the strict contours of a subcontract. On the other hand, common sense demands that any claim arising solely from an underlying subcontract be informed by that contract. The answer may turn on whether the subcontract is necessary to the payment bond claim. *See Aarow/IET LLC v. Hartford Fire Ins. Co.*, No. 19-cv-0085, 2021 WL 2673117, at *15 (E.D.Va. June 29, 2021) (holding Miller Act payment bond claim contingent on underlying contract where plaintiff's claim was based on breach of that contract); *United States ex rel. Advance Concrete, LLC v. THR Enters., Inc.*, No. 12-cv-0198, 2012 WL 3686290, at *4-5 (E.D.Va. July 18, 2012) (same). Nature-Tech appears to concede that its contract with Capitol informs its retainage request. It's not clear whether the same is true for its unpaid work request. As noted above, Defendants do not appear now to assert such contract defenses for the alleged unpaid millwork, but they have in the past and they still make bald allusions to such defenses. (ECF Nos. 29-5, at 8-9; 29-1, at 7).

V.   **Capitol's Breach of Contract Counterclaim**

Capitol counterclaims that Nature-Tech breached their Master Services Agreement ("the Agreement") by soliciting Tutor Perini. The Agreement is governed by New Jersey law. (ECF No. 27-4, 25, ¶ 16.1). In New Jersey, breach of contract requires: "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3ᵈ Cir. 2013) (citing *Coyle v. Englander's*, 199 N.J.Super. 212, 221-23 (App.Div. 1985)). New Jersey courts give effect to the unambiguous meaning of contract terms. *Id.* (citing *Kutzin v. Pirnie*, 124 N.J. 500, 507 (1991)).

The Agreement states that the parties shall not, without consent, "solicit any customers, partners, resellers, vendors or suppliers of the other Party." (ECF No. 27-4, at 16 ¶ 10-2).[7] "Solicit" is not defined and its ordinary meaning controls. "Solicit" means "to ask earnestly; to make petition; to appeal to (for something); to endeavor to obtain by asking or pleading; to plead for," *Chippy's Auto Mart, Inc. v. Howell*, 87 N.J.Super. 269,

---

[7] Defendants elsewhere raise Article 4.1, which requires prompt and diligent performance at Capitol's direction, to contend that Nature-Tech breached the Agreement, but do not advance their solicitation counterclaim on that ground.

275 (App.Div. 1965) (cleaned up), and "to entreat, urge or petition persistently," *SAB Pub. Adjusters v. Gormley*, No. A-3859-13T1, 2014 WL 7497087, at *3 (N.J.Super.Ct.App.Div. Jan. 9, 2015) (citing *Webster's II New College Dictionary* (1999)).

"[T]he plain and ordinary meaning of the term 'solicit' requires an affirmative act taken by one party—a solicitor—to obtain something from another party. By extension, solicitation requires more than the mere acceptance of, or response to, an offer." *Digital Grp., Inc. v. Sagitec Sols., LLC*, No. A-0619-15T3, 2017 WL 3568095, at *7 (N.J.Super.Ct.App.Div. Aug. 18, 2017) (unpublished) (citing *Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F.Supp.2d 514, 520 (E.D.Pa. 2010)). "Courts that have considered claims of [] solicitation generally focus on factors such as: who initiated the contact, whether the actions allegedly constituting solicitation were proactive or responsive, and whether the alleged solicitation involved active persuasion." *Fyfe Co. v. Structural Grp., Inc.*, No. 13-0176-CCB, 2016 WL 4662333, at *6 (D.Md. Sept. 7, 2016) (collecting out-of-state cases including *Meyer-Chatfield*).

Capitol has not shown that Nature-Tech solicited Tutor Perini. The record includes no affirmative act by Nature-Tech to ask, petition, or entreat Tutor Perini to contract. Instead, everything points to Tutor Perini as the solicitor. It initiated discussions about Capitol's termination. It requested information

from Nature-Tech.   Nature-Tech's communications were entirely responsive to those requests.   While the communications indicate a willingness to work with Tutor Perini if Capitol were terminated, they never urge Tutor Perini to take that action.   They do not bear any markers of any effort by Nature-Tech to persuade Tutor Perini to go into business together without Capitol.

Capitol's attempt to meet its burden relies primarily on mischaracterized facts.   It asserts that, at the pivotal meeting in April or May 2018, "Nature-Tech and Tutor Perini hatched a plot to terminate Capitol's Contract and enter into a direct contract with one another."   (ECF No. 29-1, at 10 ¶ 10).   The Nature-Tech deposition testimony it cites shows only that Tutor Perini initiated the meeting, told Nature-Tech (to Nature-Tech's surprise) that it planned to fire Capitol, and requested information to which it asserted a contractual right.   (ECF No. 29-4, at 8-10, 13-14, 63-64).   Capitol also asserts that, in their subsequent communications, Nature-Tech "provided information to Tutor Perini to fabricate false pretenses for terminating Capitol's Subcontract."   (ECF No. 29-1, at 10 ¶ 12).   The communications Capitol relies on show Nature-Tech sharing a list of outstanding work, requesting clarification about approval and payment for specific tasks, informing Tutor Perini that Capitol was responsible for shipping, and demanding information, post-notice-to-cure, before agreeing to work with Tutor Perini.   (ECF

Nos. 29-9; 29-10; 29-11; 29-12; 29-19). Capitol makes no attempt to show that any information Nature-Tech shared was false.

Absent speculation, Capitol is left with the fact that Nature-Tech communicated surreptitiously with Tutor Perini and little more. Capitol contends that "Nature-Tech understood that under the MSA it was not to have direct communications with Tutor Perini." (ECF No. 29-1, at 7 ¶ 5). Capitol is wrong to suggest that any bar on communication between Tutor Perini and Nature-Tech arose from the non-solicitation article. It does not operate as a ban on all communications between the two parties. The secrecy of the communications, and their contravention of Capitol's instructions, can support an inference that Tutor Perini and Nature-Tech did not want Capitol to know about the contents of their communications. But, even drawing all inferences in Capitol's favor, it cannot alone create an inference of improper solicitation by Nature-Tech.

The substance of Nature-Tech's communications with Tutor Perini does not add enough to change the outcome. Nature-Tech's uncontradicted testimony is that it requested a specific Tutor Perini decision-maker attend the pivotal meeting at Capitol's instruction and that it did not know Tutor Perini's true purpose for the meeting. (ECF No. 29-4, at 14, 63-64). Pre-notice-to-cure, Nature-Tech told Tutor Perini that it "would like to continue to finish the job with" Tutor Perini and informed Tutor Perini

that shipping was Capitol's responsibility. (ECF Nos. 29-10, at 2; 29-11). Post-notice-to-cure, Nature-Tech shared pricing and contract demands. (ECF Nos. 29-19, at 1; 29-20, at 1). All these communications were responsive to Tutor Perini's requests and offer to contract.

Nature-Tech's motion for summary judgment on Capitol's breach of contract counterclaim will be granted.

## VI. Capitol's Tortious Interference Counterclaim

### A.   Choice of Laws

Maryland applies the law of the place of harm to tort claims. The place of harm is "where the last act required to complete the tort occurred." *Lab. Corp of Am. v. Hood*, 395 Md. 608, 615 (2006).

Capitol notes that the last act necessary to complete tortious interference is not well-defined in Maryland law, *Terry v. Corp. Am. Family Credit Union*, No. 19-cv-1065-JKB 2019 WL 5065183, at *7 (D.Md. Oct. 9, 2019), but argues that it is where the breach of contract occurred, (ECF No. 29-1, at 24). It baldly asserts that Tutor Perini breached its contract with Capitol in Maryland. No allegation or exhibit identifies where Tutor Perini resides or from where the email terminating the contract was sent. Nor is it necessarily dispositive that the contract was governed by Maryland law. To the extent the last act is inducement, rather than breach, it may not have occurred in Maryland. Nature-Tech is a Wisconsin company and a critical event alleged by Capitol—the meeting between

22

Nature-Tech and Tutor Perini executives—occurred in Wisconsin. (ECF Nos. 1, ¶ 1; 29-4, at 5-6).

Nevertheless, the court will apply Maryland law because Wisconsin tortious interference law does not appear to differ, neither party discusses Wisconsin law, and Nature-Tech essentially concedes that Maryland law applies. (ECF Nos. 27-1, at 14; 30, at 21)).

### B. Analysis

Maryland largely follows the Second Restatement of Torts with respect to tortious interference with contract. *Océ N. Am., Inc. v. MCS Servs., Inc.*, 795 F.Supp.2d 337, 346 (D.Md. 2011); *see Prudential Real Estate Affiliates, Inc. v. Long & Foster Real Estate, Inc.*, 208 F.3d 210, 2000 WL 248170, at *3 n.5 (4th Cir. 2000) (unpublished); *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 299 (1994). The elements are: "(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages[.]" *Fowler v. Printers II, Inc.*, 89 Md.App. 448, 466 (1991) (citations omitted). The defendant's interference must also have been improper or, in other words, without justification. Some courts recognize this as a sixth element of the cause of action, while others treat it as a component of intentional interference. *Brass Metal Prod., Inc. v. E-J Enters.,*

23

*Inc.*, 189 Md.App. 210, 348 (2009) (sixth element); *Ellicott Dredges, LLC v. DSC Dredge, LLC*, 280 F.Supp.3d 724, 731 (D.Md. 2017) (component of intentional interference).  This opinion takes the latter approach.[8]

The element primarily litigated by the parties is whether Nature-Tech improperly intervened in Capitol's contract with Tutor Perini.  Nature-Tech also argues that Capitol cannot prove causation.  That argument is addressed in resolving whether Nature-Tech's conduct amounted to improper interference.

Capitol argues that Nature-Tech interfered with its contract with Tutor Perini by inducing Tutor Perini to terminate it. Inducement requires some affirmative attempt to persuade the third-party to breach.  *See Sharrow v. State Farm Mut. Ins. Co.*, 306 Md. 754, 767 (1986) (requiring "any purposeful conduct" to "induce[] or persuade[] a [third party] to discharge [the plaintiff]"); Restatement (Second) of Torts § 766, cmts. k, l, m. This can include statements without specific requests, "so long as [they] have the same effect as if a specific request were made"

---

[8] Wisconsin requires that: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Brew City Redev. Grp., LLC v. Ferchill Grp.*, 297 Wis.2d 606, 624 n.9 (Wis. 2006) (citing *Aon Risk Servs., Inc. v. Liebenstein*, 289 Wis.2d 127, 157 (Wis.Ct.App. 2005), *abrogated on other grounds by Burbank Grease Servs., LLC v. Sokolowski*, 294 Wis.2d 274, 298 (Wis. 2006)).

and "conduct conveying to the third person the [] desire to influence him not to deal with [another]." *Océ N. Am.*, 795 F.Supp.2d at 346-47 (citing Restatement (Second) of Torts § 766, cmt. k). But merely making an agreement with knowledge that the third-party cannot perform it and also perform his contract with the plaintiff is not inducement. Restatement (Second) of Torts § 766, cmt. n. As an example, if "B is under contract to sell certain goods to C" and "offers to sell them to A, who knows of the contract," "A has not induced the breach" if it "accepts the offer and receives the goods." *Id.*

As with solicitation, whether the defendant initiated contact with the third party is relevant to determine whether the defendant induced and ultimately caused the breach of the contract. *See Prudential Real Estate*, 2000 WL 248170, at *6 (citing *Sharrow*, 306 Md. at 769). A tortious interference claim is not necessarily defeated, however, if the third-party initiates contact with the defendant. A defendant improperly induces a breach if, for example, it offers in response more attractive terms than the third party had obtained from the plaintiff. *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, No. 02-cv-1565-DKC, 2007 WL 9782461, at *3 (D.Md. Sept. 17, 2007) (citing *Cumberland Glass Mfg. Co. v. De Witt*, 120 Md. 381, 393 (1913); *Prudential*, 2000 WL 248170, at *6; Restatement (Second) of Torts § 766 cmt. m).

It is *per se* improper for a defendant to interfere knowingly
with an existing contract with the intent to benefit itself or
harm the plaintiff.  *Macklin*, 334 Md. at 303-04.  Unlike with
prospective economic relations, competition cannot justify
interference with a contract. The factors for assessing whether
conduct is improper therefore merge into the interference
analysis.  Those factors include but are not limited to:

> (a) the nature of the actor's conduct, (b) the
> actor's motive, (c) the interests of the
> [party] with which the actor's conduct
> interferes, (d) the interests sought to be
> advanced by the actor, (e) the social
> interests in protecting the freedom of action
> of the actor and the contractual interests of
> the [aggrieved party], (f) the proximity or
> remoteness of the actor's conduct to the
> interference and (g) the relations between the
> parties.

Restatement (Second) of Torts § 767.  The most important factor is
the nature of the actor's conduct.  *Id.*, § 767 cmt. c.

Capitol points to no evidence that can support a finding that
Nature-Tech induced Tutor Perini to terminate its contract with
Capitol.  As discussed above, Tutor Perini approached Nature-Tech
to discuss continuing to provide millwork after Capitol was
terminated.  Nature-Tech responded to Tutor Perini's requests but
did not argue that Tutor Perini should terminate the contract.
There is no suggestion that the content of its responses could
have induced Tutor Perini to terminate by offering more competitive
terms than Tutor Perini had obtained from Capitol.  It appears

Nature-Tech gave Tutor Perini the same prices it had quoted Capitol. (ECF No. 29-1, at 19).  At most, Nature-Tech's responses and expressed willingness to continue to work with Tutor Perini may have made it easier for Tutor Perini to terminate Capitol. That does not amount to an attempt to intervene in the contract by inducing Tutor Perini's termination.  Instead, it supports finding that Nature-Tech accepted an offer from Tutor Perini that was incompatible with Tutor Perini's contract with Capitol.  As noted above, making an agreement with knowledge that the third-party may violate another agreement is not inducement.  That alone is fatal to Capitol's counterclaim.

This conclusion is reinforced by looking to several factors in the impropriety analysis.  First, Capitol has not shown that Nature-Tech violated their contract when it excluded Capitol from its communications with Tutor Perini.  Capitol certainly had an expectation that Nature-Tech and Tutor Perini would not separately discuss delivery of millwork.  But Capitol merely asserts that this was a requirement of its contract with Nature-Tech, rather than a norm.  Aside from stray references to Article 4.1, it appears incorrectly to ground this assertion in the non-solicitation clause, as discussed above.  Any suggestion that its own instructions, acknowledged but regularly disregarded, could create a material condition appears ungrounded in the contract itself or in Maryland contract law.  Indeed, had Capitol been able

27

to enforce such an order, it would likely have been in breach of its contract with Tutor Perini, which authorized Tutor Perini to investigate delays, expedite deliveries, and finish work with other subcontractors in the event of termination for cause. (ECF No. 27-2, at 10 (Section 3), 13 (Section 5E)); *see also Pritchett Control, Inc. v. Hartford Accident & Indem. Co.*, 361 F.Supp.3d 350, 356 (D.Md. 2019) (holding no tortious interference where defendant's work with the third-party was called for in its contract with plaintiff). Nature-Tech's knowledge of Tutor Perini's contract right, in combination with its lack of affirmative inducement, also undermines any finding that Nature-Tech possessed the requisite motive. *See Hearn Insulation & Improvement Co. v. Carlos Bonilla*, No. 09-cv-990-AW, 2010 WL 3069953, at *10 (D.Md. Aug. 5, 2010) (holding defendant could not have had improper motive where sole evidence was that he "believed that his actions were allowed based on [the third-party's] termination of its relationship with [the plaintiff]").

Capitol's expectancy interest in its contract was also relatively weak because Tutor Perini had concluded Capitol was in breach. If true, Tutor Perini could then terminate the contract at any time as long as it gave Capitol an opportunity to cure. (ECF No. 27-2, at 13). In that sense, Capitol's interest may have been analogous to that of an at-will employee. The law gives less protection to at-will employees' expectancy interest because their

contract can be terminated at any time.  *See Macklin*, 334 Md. at 299, 302-03 (citing Restatement (Second) of Torts § 768).

Last, Nature-Tech could hardly have been a proximate cause of Tutor Perini's decision to terminate the contract if Tutor Perini had already decided to terminate when it first contacted Nature-Tech.  *See A-Pinn Contracting LLC v. Miller Pipeline LLC*, No. CAL13-21748, 2019 WL 3731895, at *8 (Md.Ct.Spec.App. Aug. 8, 2019) (holding could not have interfered because the plaintiff asserted that the third-party "was already intent upon breaching"); *Service 1st Vending, Inc. v. Compass Grp. USA, Inc.*, No. 20-cv-3723-DKC, 2021 WL 1312906, at *4 (D.Md. Apr. 8, 2021) (holding no causation where third party terminated contract for cause).  Nature-Tech's uncontradicted testimony is that Tutor Perini "laid out their plans for terminating Capitol" at the pivotal meeting.  (ECF No. 29-4, at 8).[9]

Nature-Tech's motion for summary judgment on Capitol's tortious interference with contract counterclaim will be granted.

---

[9] Although not addressed by the parties, it is not clear that Tutor Perini's termination for cause is an applicable breach.  *See Service 1st*, 2021 WL 1312906, at *4 (holding no breach where third party issued plaintiff notice to cure and terminated for failure).  *But cf. Sharrow*, 306 Md. at 765 (referring to "termination" interchangeably with "breach" but noting that it is "unlawful" to break a contract without "sufficient ground" (quotation omitted)).

**VII. Conclusion**

For the foregoing reasons, Nature-Tech's motion for summary judgment will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge